Filed 3/18/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN D. SWEENEY et al., <br><br>     Plaintiffs and Respondents, <br><br> v. <br><br> CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO BAY REGION et al., <br><br>     Defendants and Appellants. | A153583, A153585 <br><br> (Solano County Super. Ct. Nos. FCS048136 and FCS048861) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |
| JOHN D. SWEENEY et al., <br><br>     Plaintiffs, Cross-defendants, and Respondents, <br><br> v. <br><br> SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION et al., <br><br>     Defendants, Cross-complainants, and Appellants. | |

BY THE COURT:

It is ordered that the opinion filed herein on February 18, 2021, be modified as follows:

1

At page 9, on the first line, "13627" is deleted, and "13267" is inserted in its place.

At page 9, in the first sentence of the first full paragraph, "CAO.," is deleted, and "CAO." is inserted in its place.

At page 14, in the fourth sentence of the first full paragraph, "13627" is deleted, and "13267" is inserted in its place.

At page 17, on the first line, "damn" is deleted, and "dam" is inserted in its place.

At page 25, on the fifth line, "its" is deleted.

At page 41, the third full paragraph is revised to read: "The trial court also found "the evidence [was] not sufficient to support the conclusion that the levee work adversely affected beneficial uses," nor could it "support a finding that the levee work violated requirements in the basin plan that prohibit discharges into surface waters that affect beneficial uses." "

At page 41, in the fourth full paragraph, the first sentence is revised to read: "Had the court applied the substantial evidence standard to the Regional Board's finding, as we do, it would have acknowledged ample evidence of the levee work's harm to beneficial uses."

At page 44, the first full sentence on the page is revised to read: "Res judicata " 'preclud[es] parties from contesting matters that they have had a full and fair opportunity to litigate,' " and "protect[s] against 'the expense and vexation attending multiple lawsuits, conserve[s] judicial resources, and foster[s] reliance on judicial action by minimizing the possibility of inconsistent decisions.' " (*Taylor v. Sturgell* (2008) 553 U.S. 880, 892.)"

At page 54, at the end of the Section III.E. discussion regarding "Vindictive Prosecution" and before the Section IV discussion regarding "Fair

2

Hearing (Applicable to CAO and ACL Order)" begins, the following is inserted:

"**F.    Differentiated Civil Liabilities for Sweeney and the Club**

Respondents argue that liability under the ACL must be assessed differently for Sweeney and the Club. They assert, "For the ACL, the Club should be distinguished from John Sweeney[] and should not be penalized for the levee repair, which was effectively complete [citation] before the Club took ownership of the island." In a petition for rehearing, they contend the trial court's judgment should be affirmed to the extent it set aside the civil liabilities for the Club, even though the trial court did not do so on the basis that these liabilities were separable from the liabilities imposed upon Sweeney. We will not consider this argument. " '[A]s a general rule, "issues not raised in the trial court cannot be raised for the first time on appeal." ' " (*Rancho Mirage Country Club Homeowners Assn. Hazelbaker* (2016) 2 Cal.App.5th 252, 264; *Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3 ["It is axiomatic that arguments not asserted [in the trial court] are waived and will not be considered for the first time on appeal."].) This argument was neither raised in the trial court, nor mentioned in the trial court's ruling, and we will not consider it in this appeal.

Even if Respondents had raised this point in the trial court, we still would not consider it because Respondents have not properly briefed the matter on appeal. (See *Tilbury Constructors, Inc. v. State Comp. Ins. Fund* (2006) 137 Cal.App.4th 466, 482 [matters asserted in perfunctory fashion or not adequately briefed may be passed over]; *Heavenly Valley Ski Resort v. El Dorado County Bd. Of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17 ["[W]e need not address contentions not properly briefed."].) Respondents'

3

125-page appellate brief provides only two sentences of argument on this point, without citation to authority or to the record. There is neither a factual nor legal basis presented that would permit this court to separately consider the Club's responsibility for the imposed penalties, apart from Sweeney's. The record shows that Sweeney transferred the Site to the Club in October 2014 and that Sweeney was the Club's manager. But Respondents provide no citation to the record that describes the terms or substance of that transaction. Moreover, the unpermitted work at the Site may have continued well after the transfer. (See *ante*, Background.) These facts raise a question about whether it would be proper to limit the Club's responsibility, and Respondents' briefing provides no answer. The *Sweeney* District Court Opinion, which Respondents cited at oral argument, does not help them either. It neither supplies a legal nor factual basis for the argument that fills the void in their briefing, nor does it address administrative civil liabilities issued under state law. Accordingly, we do not address Respondents' claims."

At page 62, in the second full paragraph, the first sentence is revised to read: "The trial court also concluded Respondents did not receive fair hearings under the totality of the circumstances."

At page 63, in the first sentence of the first full paragraph, item (c) is revised to read: "the Regional Board's unwillingness to keep Sweeney's private financial information confidential, combined with criticism of him for not providing more financial information,"

The petition for rehearing filed by Respondents on March 4, 2021, is denied. There is no change in the judgment.

4

Dated: _____                    _____

Fujisaki, Acting P.J.

Filed 2/18/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOHN D. SWEENEY et al., <br><br>    Plaintiffs and Respondents, <br><br>v. <br><br>CALIFORNIA REGIONAL WATER QUALITY CONTROL BOARD, SAN FRANCISCO BAY REGION et al., <br><br>    Defendants and Appellants. | A153583 <br><br>(Solano County <br>Super. Ct. No. FCS048136) |
| JOHN D. SWEENEY et al., <br><br>    Plaintiffs, Cross-defendants, <br>    and Respondents, <br><br>v. <br><br>SAN FRANCISCO BAY CONSERVATION AND DEVELOPMENT COMMISSION et al., <br><br>    Defendants, <br>    Cross-complainants, and <br>    Appellants. | A153585 <br><br>(Solano County <br>Super. Ct. No. FCS048861) |

Point Buckler (the Site) is a 39-acre tract located in Suisun Marsh. John Sweeney purchased the island and subsequently transferred ownership to Point Buckler Club, LLC (Club) (Sweeney and the Club are collectively

1

referred to as Respondents).  For months, Respondents undertook various unpermitted development projects at the Site, which included the restoration of an exterior levee surrounding it that had been breached in multiple places.

These consolidated appeals concern two administrative orders issued by the Regional Water Quality Control Board, San Francisco Bay Region against Respondents.  The first order was a cleanup and abatement order which found Respondents' development activities were unauthorized and had adverse environmental effects.  These included impacts to tidal marshlands, fish migration, and aquatic habitat.  The cleanup and abatement order directed Respondents to implement corrective actions to address the effects of their work.  The second order imposed administrative civil liabilities and required Respondents to pay approximately $2.8 million in penalties for their violations of environmental laws and regulations.

Respondents successfully challenged both orders in writ proceedings in the superior court.  Appellants Regional Water Quality Control Board, San Francisco Bay Region and its Executive Officer, Bruce Wolfe (collectively referred to as Regional Board or Board) contend the trial court made numerous legal and factual errors leading it to improperly set aside the orders.  We agree with the Regional Board and reverse both trial court judgments.

## BACKGROUND

The Site is located in Suisun Marsh at the south end of Grizzly Bay, a portion of the San Francisco Bay.

In 2011, Sweeney bought the Site, which appears to have been previously operated as a managed wetland for duck hunting.  When Sweeney purchased the property, the levee which had circumscribed the island had degraded and breached in multiple places.  Following his purchase, Sweeney

2

undertook a number of unpermitted construction and development projects, which included restoring the Site's exterior levee.

In October 2014, Sweeney transferred title of the Site to the Club, for which he was the manager and president. He began operating the Site as a private recreational area for kiteboarding. Sweeney also wanted to restore the Site as a duck hunting club.

In November 2014, staff from the San Francisco Bay Conservation and Development Commission (BCDC), a state agency with jurisdiction over the waters of the San Francisco Bay including Suisun Marsh, inspected the Site. BCDC staff notified Sweeney about their concerns with unauthorized work occurring there and identified multiple violations. They observed the levee construction work had removed tidal flow to the Site's interior and dried out tidal marsh areas. Addressing Sweeney's view that the island was a managed wetland and his stated intent to restore the island to that use, they indicated that based on available information, the history of the Site and the recent Site visit, the Site never functioned as a managed wetland and had long reverted to a tidal marsh due to neglect, abandonment, or the forces of nature. Sweeney was directed to stop work and informed that a marsh development permit was required prior to developing the Site. In addition, BCDC staff conveyed that any work that could not be retroactively approved through the permit process would likely need to be removed and the Site restored to tidal marsh. BCDC was handling the matter as an enforcement case, and potential future enforcement against Sweeney could include cease and desist orders and a civil penalty.[1]

---

[1] In November 2016, BCDC issued a cease and desist and civil penalty order which ordered Respondents to cease and desist from placing any fill within the Site, or making any substantial changes to any part of the Site that was or had been subject to tidal action before their unauthorized work.

The Regional Board commenced separate enforcement proceedings against Respondents. In July 2015, the Board issued a Notice of Violation for Respondents' unauthorized filling of federal and state waters in violation of the federal Clean Water Act and the California Water Code. Several months later, the Board issued Cleanup and Abatement Order No. R2-2015-0038 (2015 CAO) to Respondents.

In October 2015, Regional Board staff inspected the Site with representatives from other agencies, including BCDC, the U.S. Environmental Protection Agency, and the U.S. Army Corp of Engineers (Corps). The agencies wanted to better understand the nature and extent of Respondents' development activities, including the volume of fill placed for construction of the levee, and to understand the impacts of the development on tidal marsh habitat. During this inspection, BCDC staff observed that additional work had been performed since their initial November 2014 inspection. According to Sweeney, worked stopped two months earlier when Respondents first learned of the regulatory agency objections.

In December 2015, Respondents filed a petition for writ of mandate and a complaint for injunctive and declaratory relief challenging the 2015 CAO. The court granted Respondents' request to stay the 2015 CAO and enjoined the Board from enforcing the order pending a preliminary injunction hearing. In January 2016, in order to address Sweeney's procedural due process

---

Respondents were further ordered to refrain from engaging in any development activity at the Site without permits. They were directed to submit plans to restore the Site and mitigate the impacts of their unauthorized activities and ordered to pay $772,000 in administrative penalties. In a separate opinion filed today in the companion case of *Sweeney v. San Francisco Bay Conservation and Development Commission,* Case No. A153582, we reversed the trial court's order invalidating the action taken by the BCDC.

4

concerns, the Regional Board rescinded the 2015 CAO without prejudice to its ability to issue a new order.

In the ensuing months, state agencies conducted more inspections. In February 2016, the Regional Board conducted a boat survey around the Site to assess conditions and observed additional development on the island since the October 2015 multi-agency inspection. In March 2016, after securing an inspection warrant, the Regional Board conducted another Site inspection. The results of the inspection were compiled into an Inspection Report, which provided a summary of inspection activities, water quality sampling results, staff observations, and photographs.

In May 2016, an expert retained by the Regional Board issued the "Point Buckler Technical Assessment of Current Conditions and Historic Reconstruction Since 1985" (Technical Assessment). The Technical Assessment was a 400-plus-page report based on examinations of conditions at the Site over time that reported Respondents' development activities and their impacts.

Shortly after release of the Technical Assessment, the Regional Board commenced new formal enforcement proceedings against Respondents. On May 17, 2016, the Board issued a tentative cleanup and abatement order and Administrative Civil Liability Complaint No. R2-2016-1008 (ACL Complaint). The ACL Complaint proposed a $4.6 million penalty for Respondents' alleged violations.

A hearing on the tentative cleanup and abatement order was held on August 10, 2016. The Board unanimously adopted and issued Cleanup and Abatement Order No. R2-2016-0038 (CAO). The Board made dozens of findings in the CAO regarding Respondents' unauthorized activities at the Site and the  environmental harm resulting from the activities. The Board

found Respondents' activities had adverse impacts on tidal marshlands, estuarine habitat, fish migration, the preservation of rare and endangered species, fish spawning, wildlife habitat, and commercial and sport fishing. The Board concluded Respondents' activities violated the Water Quality Control Plan for the San Francisco County Basin (Basin Plan), which prohibits the discharge of fill material in quantities sufficient to harm surface waters or to adversely affect or threaten beneficial uses. The Board also found Respondents' work violated section 301 of the Clean Water Act which prohibits the discharge of pollutants in state and federal waters without a permit, and section 401, which prohibits dredge and fill activities in state and federal waters without a water quality certification. The Board ordered Respondents to submit certain technical reports and to clean up the discharged waste, abate its effects, and take corrective actions that would restore tidal circulation and marsh habitat to the Site.

A hearing was held on the ACL Complaint on December 14, 2016. The Board issued Administrative Civil Liability Order No. R2-2016-0008 (ACL Order). Respondents were found in violation of the Basin Plan and Clean Water Act and assessed $2.8 million in penalties, rather than $4.6 million as proposed.

Respondents challenged the orders in separate lawsuits. In December 2016, they petitioned under Code of Civil Procedure section 1094.5 for a peremptory writ of mandate to set aside the CAO. In May 2017, Respondents filed a second petition for a peremptory writ of mandate under Code of Civil Procedure section 1094.5 contesting the ACL Order.

In May 2017, the Attorney General's Office, representing the Board, filed a cross-complaint seeking to enforce both orders.

The trial court granted Respondents' motion to stay the accrual of civil penalties while the appeal was pending. The court also stayed substantive portions of the CAO through judgment until an appeal was filed, or the time to appeal had run.

In October 2017, the trial court heard the challenges to the CAO and ACL Order. In separate statements of decisions, the trial court granted Respondents' motions and set aside both Regional Board orders. The court also declared the Regional Board's cross-complaint seeking to enforce the CAO and ACL Order was moot. The court entered judgment in favor of Respondents, issued peremptory writs of mandate in each matter, and remanded the proceedings to the Regional Board with a directive to set aside the orders.

The Regional Board and its Executive Director Bruce Wolfe separately appealed each judgment. In July 2018, we consolidated the Board's appeal from the ACL Order judgment (Case No. A153583) and its appeal from the CAO judgment (Case No. A153585) for all purposes. We received briefing on Respondents' behalf from amicus curiae California Construction and Industrial Materials Association.

While the consolidated appeal was pending, the United States District Court for the Eastern District of California issued its opinion in *United States v. Sweeney* (Sept. 1, 2020 E.D. Cal.) ___ F.Supp.3d ___ [2020 WL 5203474] (the *Sweeney* District Court Opinion), which adjudicated the federal government's claims against Respondents for their activities at the Site under the Clean Water Act. (*Id.* at *1.) We granted the Regional Board's request for supplemental briefing on the possible res judicata effect of the federal district court's opinion on this appeal, and received briefing from the parties.

7

## DISCUSSION

## I. APPLICABLE LAW

"A party aggrieved by a final decision or order of a regional board . . . may obtain review of the decision or order of the regional board in the superior court by filing in the court a petition for writ of mandate." (Wat. Code, § 13330, subd. (b).) Code of Civil Procedure section 1094.5, our state's administrative mandamus provision, provides the procedure for judicial review of adjudicatory decisions rendered by administrative agencies (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514) and governs challenges to regional board orders. (Wat. Code, § 13330, subd. (e) ["Except as provided in this section, Section 1094.5 of the Code of Civil Procedure shall govern proceedings for which petitions are filed pursuant to this section."].) "The inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civil. Proc., § 1094, subd. (b).)

Here, the trial court ultimately concluded the Regional Board abused its discretion in issuing the CAO and ACL Order. Because the Regional Board's consolidated appeals of the court's decisions present myriad issues, each with distinct standards of review, we shall discuss the governing law and review standards during our analysis of each respective order.

## II. THE CLEANUP AND ABATEMENT ORDER

The court set aside the CAO on multiple grounds. Among its reasons, it found the Regional Board violated the requirements of Water Code section

13627, the CAO failed to satisfy the criteria for enforcement actions contained in the Porter-Cologne Water Quality Control Act, and the CAO conflicted with the Suisun Marsh Preservation Act. The Regional Board contends none of these reasons have merit. We agree.

## A. CAO Standard of Review

The parties do not dispute the applicable standards of review for the CAO., Nor do we. Pursuant to Water Code section 13330, subdivision (e), the independent judgment standard applies to the trial court's review of a cleanup and abatement order. (See *Tesoro Refining & Marketing Co. LLC v. Los Angeles Regional Water Quality Control Bd.* (2019) 42 Cal.App.5th 453, 466–467 ["Section 13330, subdivision (e) requires the trial court to exercise its independent judgment in reviewing the CAO issued by the Regional Board."].)

Under the independent judgment standard, " 'the trial court begins its review with a presumption that the administrative findings are correct[.] [I]t does not defer to the fact finder below and accept its findings whenever substantial evidence supports them. Instead, it must weigh all the evidence for itself and make its own decision about which party's position is supported by a preponderance. [Citation.] The question is not whether any rational fact finder could make the finding below, but whether the reviewing court believed the finding actually was correct.' " (*Coastal Environmental Rights Foundation v. California Regional Water Quality Control Bd.* (2017) 12 Cal.App.5th 178, 187 (*Foundation*); see also *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 817 (*Fukuda*) [under independent judgment standard a trial court must afford a strong presumption of correctness concerning the administrative findings].) "[T]he party challenging the administrative

9

decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence." (*Fukuda*, at p. 817.)

There is also no dispute about the standard of review we must employ on appeal. The parties agree that on factual matters, this court reviews the trial court's decision on the CAO for substantial evidence supporting the *trial court's* findings. We, too, agree. (See *Fukuda, supra,* 20 Cal.4th at p. 824 ["Where, 'as here, the trial court is required to review an administrative decision under the independent judgment standard of review, the standard of review on appeal of the trial court's determination is the substantial evidence test.' "].)

"In substantial evidence review, the reviewing court defers to the factual findings made below. It does not weigh the evidence presented by both parties to determine whose position is favored by a preponderance. Instead, it determines whether the evidence the prevailing party presented was substantial—or, as it is often put, whether any rational finder of fact could have made the finding that was made below. If so, the decision must stand." (*Alberda v. Board of Retirement of Fresno County Employees' Retirement Assn.* (2013) 214 Cal.App.4th 426, 435 (*Alberda*), italics omitted.)

Also, the parties agree, as do we, that we review issues of law de novo. (*Foundation, supra,* 12 Cal. App.4th at p. 190.) "We are not bound by the legal determinations made by the state or regional agencies or by the trial court. [Citation.] But we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute. (*Building Industry Assn. of San Diego County v. State Water Resources Control Bd.* (2004) 124 Cal.App.4th 866, 879 (*Building Industry*).)

## B.     The Porter-Cologne Water Quality Control Act

10

The Porter-Cologne Water Quality Control Act (Porter-Cologne or the Porter-Cologne Act) (Wat. Code, § 13000 et seq.) expresses the public's "primary interest in the conservation, control, and utilization of the water resources of the state," and intends to advance that interest by ensuring the protection of the "quality of all the waters of the state" for the public's use and enjoyment. (Wat. Code, § 13000.) Porter-Cologne was enacted in order "to attain the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (Wat. Code, § 13000; *City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619.)

The Porter-Cologne Act recognizes that the protection of water quality can best be accomplished by statewide regulation with regional administration. Thus, under the act, the State Water Resources Control Board (State Board) and nine regional boards are the principal state agencies charged with enforcing state water pollution law. (See *WaterKeepers Northern California v. State Water Resources Control Bd.* (2002) 102 Cal.App.4th 1448, 1452.) Each of the nine regional boards has a responsibility to "formulate and adopt water quality control plans" within their region and, through those plans establish water quality objectives that will "ensure the reasonable protection of beneficial uses [of waters of the state] and the prevention of nuisance." (Wat. Code, §§ 13200, 13240–13241.) The regional board that issued the CAO here oversees the San Francisco Bay Region, and it adopted the Basin Plan as its water quality control plan under the Porter-Cologne Act. The Board found Respondents violated the Basin Plan and Porter-Cologne.

11

In addition, through Porter-Cologne, the regional boards implement the federal Clean Water Act (33 U.S.C. § 1251 et seq.). (*Conway v. State Water Resources Control Bd.* (2015) 235 Cal.App.4th 671, 675.) The Clean Water Act prohibits the discharge of pollutants into any waters of the United States without a permit. (33 U.S.C. § 1311.)

### 1. *Regional Board Investigation Under Section 13267*

Porter-Cologne includes Water Code section 13267 (Section 13267). This provision authorizes a regional board to investigate the quality of the waters of the state within the region subject to its authority. (Wat. Code, § 13267, subd. (a).) The Regional Board's investigative power includes the right to ask anyone who has discharged waste that could affect the quality of waters of the state to provide the water board "technical or monitoring program reports" under penalty of perjury. (Wat. Code, § 13267, subd. (b)(1).) Section 13267 states: "The burden, including costs, of these reports shall bear a reasonable relationship to the need for the report and the benefits to be obtained from the reports. In requiring those reports, the regional board shall provide the person with a written explanation with regard to the need for the reports, and shall identify the evidence that supports requiring that person to provide the reports." (Wat. Code, § 13267.)

The trial court set aside the CAO for the Board's failure to comply with the requirements of Section 13267. The court reasoned the CAO had only "a conclusory statement asserting that it complie[d] with § 13267, but [did] not include the written explanation or otherwise explain why the burden bears a reasonable relationship to the need." The Regional Board contends the court misinterpreted the duty imposed by Section 13267 and there was no violation of Section 13267 that would warrant setting aside the order.

12

The parties have not cited, nor have we found, any case that construes the requirements of Section 13267. Regardless, its plain language makes clear that in order to require a discharger to provide the Board with any technical report, the Board must (1) provide "a written explanation with regard to the need for the reports;" and (2) "identify the evidence that supports requiring that person to provide the reports." (Wat. Code, § 13267.)

Here, the CAO explained the need for the reports and identified the evidence supporting the Board's demand. The CAO included dozens of findings to explain the need for the technical reports. The Board concluded Sweeney had engaged in numerous unauthorized activities at the Site related to his unauthorized levee construction. The Board found these unauthorized construction activities removed crucial tidal flow to the Site's interior, and caused its tidal marsh areas to dry out and vegetation to die off. The Board found Sweeney, without authorization, discharged fill material into tidal waters at the Site. It further found Sweeney's unauthorized activities "adversely impacted beneficial uses at the Site including estuarine habitat, fish migration, preservation of rare and endangered species, fish spawning, wildlife habitat, and commercial and sport fishing." These findings were the basis for the Regional Board requirement that Respondents "submit technical reports and undertake corrective action to clean up the waste discharged and abate its effects." They also served as the basis for its determination that "[t]he burden of preparing technical reports required pursuant to section 13267, including costs, bears a reasonable relationship to the need for the reports and the benefits to be obtained from the reports, namely the restoration of beneficial uses at the Site." Accordingly, the CAO provided Respondents with an adequate "written explanation regarding the need for technical reports," and it "identif[ied] the evidence that support[ed] requiring

13

that person to provide the reports." Nothing more was required under Section 13267, and the trial court erred in concluding otherwise.

Even if the Board was not required under Section 13267 to conduct a formal cost-benefit analysis before seeking the reports, Respondents argue there was nothing in the record about the burden of producing the reports, and "nothing comparing the burden to the benefits." They say the CAO violated Section 13267 for this reason because it failed to provide sufficient evidence to support its conclusion that the reports bear a reasonable relationship to the need for them and the benefits to be obtained from them. Not so. We recognize that Section 13627 requires the burden of conducting site investigations and producing reports to be reasonable in light of the benefits to be obtained. But Section 13267 contains no requirement that a CAO include any type of weighing or cost-benefit analysis. A plain reading of the CAO shows that the Regional Board was aware of the requirement that the burden of reports be proportional to their anticipated benefit. Even a brief review of the descriptions of the technical reports ordered by the Board indicates as much. For example, one report ordered was a "Point Buckler Restoration Plan" which was to set forth the "corrective actions designed to restore . . the water quality functions and value of the tidal marsh . . . existing prior to [Respondents'] unauthorized activities." The Board's findings warrant the inference that the Board understood the burden of preparing such reports were reasonably related to the benefits it aimed to accomplish, namely, the restoration of beneficial uses at the Site.

*Voices of the Wetlands v. State Water Resources Control Board* (2011) 52 Cal.4th 499, cited by both the trial court and Respondents in support of their argument on this point, does not apply. That case discussed the cost-benefit analysis of a project required under section 316(b) of the Clean Water Act (33

14

U.S.C. § 1326(b)).  (*Id.* at p. 507.)  It requires that "the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact."  (*Id.* at pp. 507–508; see also 33 U.S.C. § 1326(b).)  The case has nothing to do with the Regional Board's requirements for ordering technical reports under Section 13267.

## 2. *Regional Board Enforcement Action Under Section 13304(a)*

When a regional board discovers a potential violation of Porter Cologne or the Clean Water Act, it can pursue an enforcement action.  One of its tools is issuance of a cleanup and abatement order requiring the violator to develop and execute a remedial plan.  Water Code section 13304, subdivision (a) (Section 13304(a)) establishes a regional board's authority to issue a cleanup and abatement order to any person "who has caused or permitted, causes or permits, or threatens to cause or permit any waste to be discharged or deposited where it is, or probably will be, discharged into the waters of the state and creates, or threatens to create, a condition of pollution or nuisance." (Wat. Code, § 13304, subd. (a).)  Upon order of a regional board, the discharger shall "clean up the waste or abate the effects of the waste, or, in the case of threatened pollution or nuisance, take other necessary remedial action."  (Wat. Code, § 13304, subd. (a).)

The trial court found the conditions for issuing a CAO were not satisfied.  As we will explain, the trial court erred.  It either drew erroneous conclusions on issues of law, or its factual findings were unsupported by substantial evidence.

### a.  Waste

The trial court concluded that Respondents did not discharge "waste" as the term is used in Section 13304(a).  In the trial court's view, the "dirt

15

used to repair the levee" was not waste but rather "a valuable building material, not something discarded as worthless or useless." We conclude the trial court employed an overly restrictive interpretation of the term "waste" as it is used in Section 13304(a) to conclude the requirements for a cleanup and abatement order under Porter-Cologne were not met.

Because the Porter-Cologne Act is a law " 'providing for the conservation of natural resources,' " it is " 'of great remedial and public importance and thus should be construed liberally' [citation] so as to promote the general object sought to be accomplished." (*Coastside Fishing Club v. California Resources Agency* (2008) 158 Cal.App.4th 1183, 1202; *United Artists Theatre Circuit, Inc. v. California Regional Water Quality Control Bd.* (2019) 42 Cal.App.5th 851, 866–867; cf. *County of Los Angeles v. State Water Resources Control Bd.* (2006) 143 Cal.App.4th 985 [court defers to regional board expertise in construing language which is not clearly defined in statutes].)

Porter-Cologne defines "waste" as "sewage and any and all other waste substances, liquid, solid, gaseous or radioactive, associated with human habitation, or of human or animal origin, or from any producing, manufacturing, or processing operation of whatever nature prior to, and for purposes of, disposal." (Wat. Code, § 13050, subd. (d).) Here, the parties do not dispute what fill material was used to reconstruct the levees at the site. Respondents used spoils from trenches excavated at the site to build up the levees. Accordingly, whether reconstruction of the levees involved the discharge of waste is a legal issue we review de novo.

A leading case construing the term "waste" under Porter-Cologne is *Lake Madrone Water Dist. v. State Water Resources Control Bd.* (1989) 209 Cal.App.3d 163 (*Lake Madrone*). There, a State Board abatement order

16

required a damn operator to refrain from flushing accumulated sediment into a creek and to submit a plan for its cleanup. (*Id.* at p. 167.) The released sediment was deposited in the creek up to 18 inches deep, and "chok[ed] [the creek's] pools and shoreline . . . clogging its spawning areas so heavily as to destroy fish and aquatic life." (*Id.* at p. 166.) The dam operator challenged the State Board's view that the accumulated sediment passing through the dam's gate valve was "waste" within the meaning of Porter-Cologne. (*Id.* at pp. 168–169.) Citing the legislative intent behind Porter-Cologne and prior Attorney General Opinions,[2] the court concluded, "There is no doubt that concentrated silt or sediment associated with human habitation and harmful to the aquatic environment is 'waste' under the statute." (*Id.* at p. 169.) Acknowledging the silt was "innocuous in its unconcentrated form," it explained that "by furnishing a man-made artificial location for its concentration, the innocuous substance [was] changed into one . . . deadly to aquatic life." (*Id.* at pp. 169–170.) It found the concentrated sediment clogging the creek associated with human habitation, as well. (*Ibid.*)

Here, there is no dispute that Respondents used the fill material to replace a breached levee in order to facilitate kiteboarding or duck hunting club purposes. Thus, the act of placing the fill in tidal marsh and tidal waters associated the fill material with human habitation and activities. Even though there is no claim that the fill material was contaminated or harmful in a general sense, it was harmful as used in reconstructing the levee in tidal wetlands. Respondents' discharge of fill material resulted in

---

[2]     The Regional Board requests we take judicial notice of the following two Attorney General Opinions: 27 Ops.Cal.Atty.Gen. 182 (No. 55-236, March 30, 1956) and 63 Ops.Cal.Atty.Gen. 51 (No. 79-906, January 25, 1980) [1980 WL 96799], both of which were cited in *Lake Madrone, supra,* 209 Cal.App.3d 163. (See *id.* at p. 170.) Respondents do not oppose these requests. We grant them.

17

excess sedimentation that smothered estuarine habitat, blocked tidal flows and direct overland tidal flooding, restricted the beneficial uses of habitat by fish and endangered and rare species, caused the dieback of tidal marsh vegetation, degraded habitat for waterfowl, and resulted in excessive salinity, turbidity and discoloration of the Site's interior waterways.

In exercising its independent review, the trial court found the fill material created no such harm and agreed with Respondents that their levee work did not "unreasonably affect beneficial uses." But this finding was not supported by substantial evidence as no rational fact finder could have reached such a decision on the basis of the evidence in the administrative record. When the Board responded to Respondents' opposition to the tentative cleanup and abatement order, the Board's evidence demonstrated that the Site had been a tidal marsh before the levee repair. The Board's expert identified the harms resulting from converting the Site from tidal marsh to a largely dry island. There were adverse impacts to the vegetation and soil on the island. The Technical Report documented "a mass dieback" of marsh vegetation throughout the diked interior of the island resulting in "growth-inhibited marsh vegetation." The Board's expert also presented evidence of harm to wildlife that occurred because the levee cut off tidal connectivity to the island. Suisun Bay including the Site was designated critical habitat for Delta smelt and Chinook salmon, and the drainage and diking of the Site risked reductions in food and precluded access to tidal channels for foraging. This evidence of harm associated with Respondents' use of the fill material made it "waste" within the meaning of Porter-Cologne. Our interpretation aligns with the intent behind Porter-Cologne to preserve natural resources and protect the environment. (Cf. *Lake Madrone, supra*, 209 Cal.App.3d at p. 169 [observing that waste could encompass discharged

18

fine-grained materials into a stream used for fishing and fish spawning if fishery were adversely affected].)[3]

Respondents seek to distinguish *Lake Madrone* based on the value of the fill material which they used to make "a valuable improvement to the property," in contrast to the sediment flow released from the dam in that case, noting the sediment "was of no value to the dam operators, who were discarding it as valueless." The trial court agreed, albeit incorrectly, that the fill material could not be waste because it was being used as a valuable building material and not "something discarded as abandoned or useless." But the fact that a particular material may have commercial value does not preclude it from being waste under the Porter-Cologne Act. We follow *Lake Madrone* which clearly instructs that Porter-Cologne does not require "waste" to be sewage or some sort of worthless byproduct. Its characterization did not turn on the purported value of the discharged material but rather the harm it caused to the environment. (See *Lake Madrone*, *supra*, 209 Cal.App.3d at p. 170.) Thus, despite the seemingly benign character of the fill material used by Respondents, it could still be waste if it was harmful when used to repair the levee.

*Waste Management of the Desert, Inc. v. Palm Springs Recycling Center, Inc.* (1993) 7 Cal.4th 478, cited by Respondents for the proposition that the

---

[3] The Regional Board requests we take judicial notice of the following orders: State Water Resources Control Board Order No. WQ 77-5, State Water Resources Control Board Water Quality Order No. 2004-004-DWQ. They contend these orders are relevant to the issue of whether earthen materials, dredge or fill material, or sediment constitutes waste under Porter-Cologne. Respondents oppose these requests. We deny the Regional Board's requests as to these matters because they are unnecessary to resolve the issues before us. (See *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 (*Mangini*) [" 'Matters otherwise subject to judicial notice must be relevant to an issue in the action.' "].)

fill used here cannot be waste because it was useful material intentionally deposited, is also distinguishable. There, our Supreme Court interpreted the definition of "solid waste" in the California Integrated Waste Management Act (Pub. Resources Code, § 40191), a statute that addresses whether the owner of recyclable materials could sell them to someone other than "the exclusive franchisee" selected by a city to provide "solid waste handling services." (*Id.* at p. 481.) In that context, whether the recyclable materials could be considered waste turned on whether the owner of the materials elected to sell them as recyclables rather than just throw them away. (*Id.* at p. 486.) The court concluded that recyclables were not waste until they were actually discarded. (*Id.* at p. 484.) We decline to define "waste" as the term is used in Porter-Cologne based upon whether a material is worthless or useless in an economic sense from the owner's perspective. Such a construction would not be consistent with the policy of environmental protection that is to animate the Porter-Cologne Act.

The federal district court opinion Respondents cite, *Tahoe-Serra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (D.Nev. 1999) 34 F.Supp.2d 1226, 1254, is neither controlling nor applicable. There, the court acknowledged "waste" could include sediment generated during home construction. (*Id.* at pp. 1251–1254.) Its holding was that the act of building houses was not a "discharge" or "disposal" of waste that could create a nuisance. (*Ibid.*) The district court never concluded that fill material was not waste, and its holding has no bearing on the question before us.

Respondents' final argument on this point is that the Corps has opined that the "definition of waste does not include discharges of dredge or fill material." We are not persuaded. The Corps opinion Respondents rely upon was made in a comment letter from an official in a regional Corps office

to the State Board. As such, it lacks the force of law and does not warrant any deference. (*Christensen v. Harris County* (2000) 529 U.S. 576, 587 [interpretations contained in an opinion letter lack force of law and do not warrant deference]).[4]

For the aforementioned reasons, we also decline the invitation of amicus to hold that the definition of waste cannot include earthen material such as soil, sand and gravel. As the authorities make clear, it is not the character of a material that makes a substance, organic or otherwise, waste under Porter-Cologne, it is the uses to which the material is employed. Moreover, not all fill material is created equal or suitable for all purposes, and approved wetland fill may require specific properties. (Cf. *Sierra Club v. U.S. Army Corps of Engineers* (11th Cir. 2007) 508 F.3d 1332, 1336.)

### b. Discharge

The trial court also concluded Respondents' activities did not constitute "discharges" under Porter-Cologne. Because the term "discharge" is not defined in Porter-Cologne, the trial court relied on dictionary definitions of "discharge" that stated the term meant "[t]o allow (a liquid, gas, or other

---

[4]    We are also not persuaded that the opinion presents the official position of the Corps, since it is inconsistent with its frequently enforced and longstanding position that discharged sediment constitute "pollutants" under the Clean Water Act. (See, e.g., *Borden Ranch Partnership v. U.S. Army Corps of Engineers* (9th Cir. 2001) 261 F.3d 810, 814–815, aff'd 537 U.S. 99 (2002); *Rybachek v. U.S. E.P.A.* (9th Cir. 1990) 904 F.2d 1276, 1285-1286; *United States v. Deaton* (4th Cir.2000) 209 F.3d 331, 335-336.) Indeed, the Corps reached that conclusion with respect to the fill material Respondents used here. Following the October 2015 Site inspection, the Corps prepared a record memorandum which stated, "Field findings confirmed that an unauthorized discharge of fill had occurred within waters of the U.S." under the Clean Water Act. On that basis, the United States sued Respondents, and the trial court found the fill material Respondents were pollutants under the Clean Water Act. (See *Sweeney* District Court Opinion, *supra*, 2020 WL 5203474, at pp. *22-*25.)

21

substance) to flow out from where it has been confined," "to give outlet or vent to," and "[to] emit." The court concluded that in its ordinary meaning, " 'discharge' . . . does not include a removal." It observed that "[a]mong the unauthorized activities" identified in the CAO were "the excavation of ditches and the removal of vegetation." As the court concluded these removals of fill material were not "discharges" within the meaning of Porter-Cologne, the Board had no authority to regulate Respondents' activities under the CAO.

The parties do not dispute this common sense meaning of "discharge" as applied to Porter-Cologne, and neither do we. Rather, whether this element of the statute was met does not present a legal issue but a factual one. Factually, the court erred. Its decision impliedly found that the only activities regulated under the CAO were Respondents' excavation of ditches and removal of vegetation. However, no rational fact finder could have made such a finding. Indeed, the court readily acknowledged that ditch excavation and vegetation removal were "*[a]mong* the unauthorized activities" identified in the CAO. (Emphasis added.) Numerous activities not addressed by the trial court qualified as discharges. In their response to the 2015 CAO, Respondents acknowledged they placed fill materials into waters at the Site in constructing and replacing the levees. Sweeney admitted discharges by stating the following in his declaration accompanying Respondents' challenge to the tentative cleanup and abatement order: "I dug out material from an artificial ditch inside the levee and placed the material on the existing levee. Some material was placed where the levee had been breached . . ." The trial court's conclusion that there were no discharges at the Site because the unauthorized activities consisted solely of removals of fill material was error because it completely disregarded the evidence and significance of discharges of large amounts of fill to build and replace levees.

22

### c. Waters of the State

The trial court also concluded the Board's issuance of the CAO did not satisfy the requirement under Porter-Cologne that Respondents' waste be discharged into "waters of the state." The court found the Regional Board's consultants were not credible because they initially said the Site interior was inundated with tides on a daily basis but changed their positions when Sweeney testified that he had never seen the interior inundated, except for water in the channels and ditches. The trial court also found "the interior of the [Site] (except for the channels and ditches) was dry land rather than waters of the state," and that *most* of Respondents' work occurred on dry land. Again, the court erred.

Porter-Cologne defines "waters of the state" as "any surface water or groundwater, including saline waters, within the boundaries of the state." (Water Code, § 13050, subd. (e).) There is no real dispute that a significant portion of Respondents' discharges of fill material occurred in waters of the state. The trial court's finding that "the interior of the island (except for the channels and ditches) was dry land rather than waters of the states" recognizes that the Site's "channels and ditches" were bodies of water. These were waters of the state. Respondents do not disagree. Respondents' Brief addresses the Regional Board's contentions on this point under the heading "*Most* Activities Were Not In 'Waters of the State.'" We consider this an acknowledgement that at least *some* of Respondents' activities were in waters subject to Porter-Cologne jurisdiction. Nor do Respondents dispute the Board's expert opinion that the island's channels and ditches were subject to daily tidal action, thus refuting any finding that the Site consisted of only dry land. We do not see how Respondents could credibly claim that repair and replacement of segments of the outer levee and restriction of tidal flow into

23

some areas of the Site did not occur in waters of the state. Because significant waters of the state were affected by Respondents' activities, this element of Porter-Cologne was satisfied, and the trial court's decision to set aside the CAO on this ground was erroneous.

### d. Condition of Pollution

Finally, the trial court concluded Respondents' activities did not create a "condition of pollution" at the Site under Porter-Cologne. As we discussed in our analysis of the "waste" element, the trial court rejected the Regional Board's finding that Respondents' levee work unreasonably altered water quality so as to alter beneficial uses of the water at the Site, and found there was no direct evidence of harm to the environment. Accordingly, it concluded Respondents' levee work "did not unreasonably affect beneficial uses." The trial court went on to find the levee work actually promoted the beneficial uses of the Site's waters by aiding in the restoration of functioning duck ponds. Again, the court made factual and legal errors.

Factually, the findings of no harm to beneficial uses at the Site were unsupported by substantial evidence as no rational trier of fact could have reached that conclusion as we explained in Section II.B.2.a., *ante*.

Legally, the court construed the "condition of pollution" element of Porter-Cologne far too narrowly. A regional board is authorized to issue a cleanup and abatement order to a discharger who "creates, or threatens to create, a condition of pollution or nuisance." (Wat. Code, § 13304, subd. (e).) "Condition of pollution" is defined as "an alteration of the quality of the waters of the state by waste to a degree which unreasonably affects the waters for beneficial uses." (Wat. Code, § 13050, subd. (l)(1).)

Notably, under Section 13304(a), a cleanup and abatement order can be issued when the discharger "creates" a pollution condition or *threatens to*

24

*create*" a condition of pollution. (Wat. Code, § 13304, subd. (a), emphasis added.) Under the court's interpretation, the CAO could only issue if Respondents' waste created or was creating a condition of pollution. The court found "the levee work did not unreasonably affect" waters for beneficial uses and its "the asserted harm to fish was unquantified and uncertain," so it set the CAO aside. The trial court's statutory analysis failed to recognize that *threat* of a condition of pollution can justify issuance of a cleanup and abatement order. (See Wat. Code, § 13304, subd. (a), (e).) Even if we were to accept the court's finding that the "asserted harm to fish was unquantified and uncertain," the finding would not conflict with issuance of the CAO so long as Respondents' discharges threatened to create a condition of pollution. There was ample evidence in the Board expert's Technical Assessment and response to Respondents' submissions of likely, potential, or threatened harm to habitat and species that the trial court could not legitimately disregard. On this basis Porter-Cologne was satisfied, and the trial court's decision to set aside the CAO because there was no showing of a condition of pollution was erroneous.

The Regional Board also argues the trial court committed legal error by disregarding an independent basis for upholding the CAO unrelated to the "condition of pollution" element in Section 13304(a). Read fully, the Board argues that Water Code section 13304, subdivision (a) also allows a regional board to issue a cleanup and abatement order when discharges of waste into jurisdictional waters occur "in violation of [a] waste discharge requirement or other order or prohibition issued by a regional board or the state board." (Wat. Code, § 13304, subd. (a).) The Regional Board contends Respondents' violation of a discharge prohibition in the Basin Plan independently justified

25

the CAO. In light of the conclusions we reach on the CAO, we need not consider this argument for purposes of our CAO analysis.[5]

## C.    Suisun Marsh Preservation Act

In 1977, the Legislature enacted the Suisun Marsh Preservation Act (Preservation Act or Act), codified in Division 19 of the Public Resources Code. The Preservation Act protects valuable natural resources within the Suisun Marsh, and charges BCDC with the ultimate authority over its implementation. (Pub. Resources Code, § 29000 et seq.; see also *Sustainability, Parks, Recycling & Wildlife Legal Defense Fund v. San Francisco Bay Conservation and Development Commission* (2014) 226 Cal.App.4th 905, 915–916.) As directed under the Act, BCDC prepared and adopted the Suisun Marsh Protection Plan (Protection Plan) to "preserve the integrity and assure continued wildlife use of the Suisun Marsh." (Pub. Resources Code, § 29113, subd. (a).) The Protection Plan was intended to "preserve and enhance the quality and diversity of the Suisun Marsh aquatic and wildlife habitats and to assure retention of upland areas adjacent to the Marsh in uses compatible with its protection." (BCDC, Protection Plan (Dec. 1976) <https://www.bcdc.ca.gov/plans/suisun_marsh.html> [as of Feb 18, 2021] (*SMPP*).)[6] Section 29302, subdivision (a) (Section 29302(a)) of the Preservation Act "imposes a judicially enforceable duty on state agencies to comply with, and to carry out their duties and responsibilities in conformity

---

[5]    The Regional Board requests we take judicial notice of Regional Water Board Cleanup and Abatement Order No. R2-2017-1021 and Regional Water Board Cleanup and Abatement Order No. R2-2016-1038. They contend these orders are other issues related to the Regional Board's authority to issue the CAO. Respondents oppose these requests. We deny the Regional Board's requests as to these matters because they are unnecessary to resolve the issues before us. (See *Mangini*, *supra*, 7 Cal.4th at p. 1063.)

[6]    We take judicial notice on our motion of the Protection Plan. (Evid. Code, § 452, subdivision (c).)

26

with, this this division and the policies of the protection plan." (Pub. Resources Code, § 29302, subd. (a).)

The trial court concluded the Preservation Act imposed a restraint on the Board's authority and that the Board failed to "act[] in conformity with the Preservation Act and the policies of the Protection Plan" in violation of Section 29302(a) when it issued the CAO. It reached this conclusion after finding Respondents' "levee and excavation work was done to restore the duck ponds at Point Buckler and provide waterfowl with food and habitat, and that [both orders] harm[] waterfowl and their food supply and habitat by prohibiting [Respondents] from repairing the levee, establishing duck ponds, and planting duck food."

In issuing the CAO, the trial court determined the Board undermined the policy and intent of the Protection Plan to preserve and protect duck hunting clubs as a legitimate use for wetlands, thus, according to the trial court, the CAO was invalid. It made no matter to the trial court that the CAO could also be authorized under Porter-Cologne. In the trial court's view, Porter-Cologne's remedial directives should have been harmonized to account for the preference for duck clubs expressed in the Protection Plan and thereby comply with Section 29302(a). The court made a point of observing, "[T]he Regional Board can comply with the requirements of the Preservation Act without violating the Porter Cologne Act, and that the two statutes are not in conflict here."

The Regional Board contends issuance of the CAO did not violate the Preservation Act. The Board first argues that the court's ruling is based upon a misreading of the Act. The Board argues that in context, Section 29302(a) does not apply to enforcement actions taken by state agencies under authorizing provisions of state law. We agree. A reading of Section 29302(a)

27

in context confirms that it applies to agency development or control over wetlands, not an agency's exercise of police power. While subsection (a) provides that agencies must act in conformity with the Preservation Act, subsection (b) exempts agencies from the permit process for wetland development and subsection (c) exempts agencies from specific water quality standards or delta outflow requirements. (Pub. Resources Code, § 29302, subds. (a),(b), (c).) Moreover, section 29301 makes clear that the Preservation Act "does not increase, decrease, duplicate, or supersede the authority of any existing state agency." (Pub. Resources Code, § 29301.) As part of the same statutory scheme, section 29301 and 29302 should be read together and each section given its intended meaning and operable effect. (See *Sangster v. California Horse Racing Bd.* (1988) 202 Cal.App.3d 1033, 1039, fn. 10 [noting "settled principle" that " '[f]or purposes of statutory construction, the various pertinent sections of [the statute] must be read together and harmonized if possible' "].) A proper reading of Section 29302 makes clear that it has no impact on the regulatory authority of the Board over wetlands, and it should not have been relied upon by the trial court to invalidate the CAO.

But even if Respondents are correct that the Board's enforcement actions were subject to the Preservation Act, there still would be no violation. The trial court's conclusion that the Preservation Act and Porter-Cologne are not in conflict was correct as far as it goes. But as we will explain, the court's ruling that the Regional Board "failed to act in conformity with the Preservation Act and policies of the Protection Plan" was error.

The trial court's conclusion was premised, in part, on its view that the Regional Board's regulatory authority over illegal discharges in the marsh was constrained by the Preservation Act, and that the Act exempted

28

Respondents from compliance with other pollution laws. Section 29301 of the Preservation Act makes clear neither is the case. It states, "Except as otherwise expressly provided in this division, *enactment of this division does not increase, decrease, duplicate, or supersede the authority of any existing state agency*." (Pub. Resources Code, § 29301, emphasis added.) The trial court did not consider the effect of section 29301, and Respondents have not identified any provision in the Preservation Act which expressly changes the authority of the Regional Board, nor have we.

Section 29006, subdivision (c) of the Act supports our view of the Board's authority. It states: "No provision of [the Preservation Act] is a limitation on . . . the power of the Attorney General to bring an action in the name of the people of the state on his own motion or at the request of any state agency having standing under provisions of law other than this division, to enjoin any waste or pollution of the marsh." (Pub. Resources Code, § 29006, subd. (c).) Thus, the Preservation Act allows the Attorney General, at the Regional Board's request, to pursue actions to stop pollution of wetlands. Indeed, the Attorney General's cross-complaint against Respondents to enforce the CAO is an exercise of such authority.

Nor does the Preservation Act exempt Respondents from compliance with other water quality laws including Porter-Cologne and the Clean Water Act. Section 29500 of the Preservation Act establishes that any entity seeking to undertake a development project in the marsh "shall obtain a marsh development permit," which is *"[i]n addition to obtaining any other permit required by law from any local government or from a state, regional, or local agency*." (Pub. Resources Code, § 29500, emphasis added.) This is another provision of the act that does not appear to have been considered by the trial court.

29

Respondents have not identified any provision in the Preservation Act that impairs the Regional Board's authority to require discharge permits, or to bring enforcement actions to curtail or remediate unlawful discharges.

Since it is clear the Preservation Act does not undercut the Regional Board's regulatory authority, we will address the "judicially enforceable duty" the trial court concluded Section 29302(a) imposes on state agencies. The trial court's finding that Respondents' "levee and excavation work was done to restore duck ponds at [the Site] and provide waterfowl with food and habitat" and that the CAO "harmed waterfowl and their food supply and habitat by prohibiting [Respondents] from repairing the levee, establishing duck ponds, and planting duck food" demonstrated the court's view that the Preservation Act favored the restoration of duck hunting clubs over any other purposes that were intended to be served when the Regional Board issued the CAO. According to the trial court, by issuing a CAO which undermined duck habitat restoration and therefore harmed waterfowl and their food supply, the Regional Board failed to comply with its "judicially enforceable duty" under the Preservation Act. This was another error. Section 29302(a) does not mandate the Regional Board comply with any enforceable duty Respondents claim.

"Courts have delineated what is necessary to establish a mandatory duty. 'First and foremost, ... the enactment at issue [must] be obligatory, rather than merely discretionary or permissive, in its directions to the public entity; it must require, rather than merely authorize or permit, that a particular action be taken or not taken.' [Citation.] 'It is not enough, moreover, that the public entity or officer have been under an obligation to perform a function if the function itself involves the exercise of discretion.' [Citation.] Moreover, '[c]ourts have . . . [found] a mandatory duty only if the

30

enactment "affirmatively imposes the duty and provides implementing guidelines." ' [Citation.] ' " '[T]he mandatory nature of the duty must be phrased in explicit and forceful language.' [Citation.] 'It is not enough that some statute contains mandatory language. In order to recover plaintiffs have to show that there is some specific statutory mandate that was violated by the [public entity]." ' " (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 348–349 (*State Hospitals*).) Whether a particular statute imposes "a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts." (*Creason v. Department of Health Services* (1998) 18 Cal.4th 623, 631.)

Section 29302(a) sets forth no mandatory duty directing state agencies to carry out activities in a manner favorable to duck hunting clubs. In fact, Section 29302(a) makes no reference to such clubs. Rather, it provides that state agencies must carry out their responsibility in conformity with "this division and the policies of the protection plan." (Pub. Resources Code, § 29302.) Such broad language did not impose a specific mandatory duty on the Regional Board. (See *State Hospitals*, *supra*, 61 Cal.4th at p. 350 ["A mandatory duty is created only when an enactment requires an act that is clearly defined and not left to the public entity's discretion or judgment."].)

Section 29302(a)'s reference to "this division" refers to the Preservation Act, and the Act does not specify any mandatory duty or fealty to duck clubs. The Preservation Act is codified in seven chapters of the Public Resources Code and consists of scores of statutory provisions reflecting multiple objectives and directives for the protection of Suisun Marsh. (See Pub. Resources Code, §§ 29000–29612.) The trial court did not identify or discuss any provision in the Preservation Act that would obligate the Regional Board

31

to exercise its enforcement authority in a manner friendly to duck clubs. Respondents suggest such a duty is imposed by section 29002 of the Act. But that provision is an all-encompassing statement of legislative findings[7] that describes the marsh and its role as critical habitat for waterfowl and other wildlife. (Pub. Resources Code, § 29002.) It states " the policy of the state to preserve and protect resources of this nature for the enjoyment of the current and succeeding generations" but it does not establish a clearly defined duty that prescribes how a state agency must carry out its enforcement duties in service of such policies. Nor does it elevate the preservation of duck hunting clubs over tidal wetlands or instruct the agency to prioritize habitat for waterfowl over other wildlife, including endangered species.

---

[7]     Public Resources Code section 29002 states in full: "The Legislature hereby finds and declares that the Suisun Marsh, consisting of approximately 55,000 acres of marshland and 30,000 acres of bays and sloughs, and comprising almost 10 percent of the remaining natural wetlands in California, plays an important role in providing wintering habitat for waterfowl of the Pacific Flyway; that during years of drought the area becomes particularly important to waterfowl by virtue of its large expanse of aquatic habitat and the scarcity of such habitat elsewhere; that the area provides critical habitat for other wildlife forms, including such endangered, rare, or unique species as the peregrine falcon, white-tailed kite, golden eagle, California clapper rail, black rail, salt-marsh harvest mouse, and Suisun shrew; that the existence of this wide variety of wildlife is due to the relatively large expanse of unbroken native habitat and the diversity of vegetation and aquatic conditions that prevail in the marsh; that man is an integral part of the present marsh ecosystem and, to a significant extent, exercises control over the widespread presence of water and the abundant source of waterfowl foods; that the Suisun Marsh represents a unique and irreplaceable resource to the people of the state and nation; that future residential, commercial, and industrial developments could adversely affect the wildlife value of the area; and that it is the policy of the state to preserve and protect resources of this nature for the enjoyment of the current and succeeding generations." (Pub. Resources Code, § 29002.)

32

The "policies of the Protection Plan" do not contain any clearly defined duty to promote duck hunting clubs to the exclusion of all other Suisun Marsh policies.[8]  There are more than 50 enumerated policies across a half dozen areas in the Protection Plan, and there is no indication that certain policies take precedence over others.

Respondents contend that notwithstanding its multiple objectives, the Preservation Act "was enacted to preserve duck clubs and duck habitat." Respondents rely on two Plan policies to support this proposition.  First, they cite the "Land Use and Marsh Management" policy which states "managed wetlands . . . should be included in a primary management area" and within such area, "existing uses should continue."  They note that duck clubs are managed wetlands and further observe  certain findings under this policy endorse the "[p]rovision of habitat attractive to waterfowl" and the "[i]mprovement of water distribution and levee systems."  The second policy they cite is a Recreation and Access policy which states, "Continued recreational use of privately-owned managed wetlands should be encouraged."  It is possible that these two policies would be served by the duck hunting club Respondents endeavored to restore, but they are not the Protection Plan's only policies or anywhere designated as its most important

---

[8]      The "policies of the protection plan," a defined term, refers to "the policies set forth in Part II . . . of the protection plan." (Pub. Resources Code, § 291113, (b).)  Part II of the Protection Plan sets forth myriad "Findings and Policies" in several different categories.  For examples, under the category "Environment," four policies are enumerated.  Under the category "Water Supply and Water Quality," twelve distinct policies are identified.  Under the category "Natural Gas Resources," six policies are listed, one which has four subsections and another which has ten.  The "Utilities, Facilities and Transportation" has ten policies.  The "Recreation and Access" category list five policies.  Under the "Water-Related Industry" category, there are seven policies.  In the "Land Use and Marsh Management" category, 17 policies are enumerated.   (See generally *SMPP, supra.*)

ones.  Other Plan policies, many of which appear to have equal value as beneficial uses that would be served by implementation of the CAO, were simply not considered by the court.  The Plan contains no directives to state agencies charged with implementing a statutory scheme that seeks to advance more than 50 policy objectives that they are to favor any single objective over any other.  Nor is there any instruction for how state agencies subject to the Preservation Act are to weigh policies which conflict or compete with each other.  Absent such specific directives, entities subject to the Plan or charged with enforcing it are given considerable discretion in how they carry out their activities in conformity with the Plan's policies.  The Preservation Act did not impose a mandatory duty on the Regional Board to follow any particular policy supportive of duck clubs when pursuing an enforcement action.

## III.   ACL ORDER

The trial court also set aside the ACL Order on multiple grounds.  Among other reasons, it found the ACL Order violated the Eighth Amendment's prohibition against excessive fines, was in conflict with the Preservation Act, and was the result of a vindictive prosecution.  Throughout its analysis, it found the Regional Board's findings were not supported by the evidence.  The Regional Board contends none of these reasons were valid or justified discarding the ACL Order, and the assessed penalties were proper.  As we will explain, we agree.

### A.    Standard of Review

In contrast to their agreement on the standards of review that applied to the CAO, the parties disagree on the standards of review applicable to the ACL Order.

### 1. *The Trial Court's Review of ACL Order*

The first dispute focuses on whether the trial court applied the proper standard in its review of the ACL Order. The Regional Board asserts that "the trial court was to review the findings in the [ACL Order] under the substantial evidence standard" but failed to do so. Respondents contend that each of the issues they raised to challenge the ACL Order requires a different standard of review. They contend "the trial court should have applied its independent judgment" to review of the Board's findings, but acknowledge "the applicable standard is not clear." We conclude the trial court should have reviewed the Regional Board's findings for substantial evidence.

As here, when a party challenges a final regional board order in a petition for writ of mandate under Code of Civil Procedure section 1094.5, abuse of discretion is established and a writ of mandate should issue if an agency either failed to proceed in the manner required by law, did not support its decision with adequate findings, or if its findings are not supported by the record. (Wat. Code, § 13330, subd. (b); Code Civ. Proc., § 1094.5, subd. (b).)

Section 1094.5, subdivision (c) presents two distinct standards of review a trial court is to use when determining whether an agency abused its discretion: "Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).)

As directed by Water Code section 13330, subdivision (e), the trial court's review of an administrative civil liabilities order is governed by the

35

substantial evidence standard.  "For the purposes of subdivision (c) of Section 1094.5 of the Code of Civil Procedure, the court shall exercise its independent judgment on the evidence in any case involving the judicial review of  . . . a decision or order of a regional board for which the state board denies review under Section 13320, *other than a [civil liability] decision or order issued under Section 13323.*"  (Wat. Code, § 13330, subd. (e), emphasis added; see Wat. Code, § 13323, subd. (a) ["any executive officer of a regional board may issue a complaint to any person on which administrative civil liability may be imposed pursuant to this article"].)  Thus, a trial court does not exercise its independent judgment on the evidence when it reviews administrative civil liability orders as it would if it were reviewing cleanup and abatement orders. (*Ante*, Section II.A.)  Accordingly, while the trial court could exercise its independent judgment in reviewing the CAO, its standard for the ACL Order was substantial evidence.

"In substantial evidence review, the reviewing court defers to the factual findings made below.  It does not weigh the evidence presented by both parties to determine whose position is favored by a preponderance. Instead, it determines whether the evidence the prevailing party presented was substantial—or, as it is often put, whether any rational finder of fact could have made the finding that was made below.  If so, the decision must stand." (*Alberda, supra,* 214 Cal.App.4th at p. 435 ; see also *Marina County Water Dist. v. State Water Resources Control Bd.* (1984) 163 Cal.App.3d 132, 138 [under substantial evidence review, superior court's "task would have been merely to determine whether there was substantial evidence in the record, taken as a whole, to support the Board's action, whether the court itself would have come to the same conclusion on that evidence or not"].)

Respondents argue that because the Regional Board's decision affected a fundamental vested right "the trial court should have applied its independent judgment" to the evidence. Generally, "[i]f the administrative decision involved or substantially affected a 'fundamental vested right,' the superior court exercises its independent judgment upon the evidence disclosed in a limited trial de novo in which the court must examine the administrative record for errors of law and exercise its independent judgment upon the evidence. [Citations.] The theory behind this kind of review is that abrogation of a fundamental vested right 'is too important to the individual to relegate it to exclusive administrative extinction." (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1056–1057 (*JKH Enterprises*).) "On the other hand, '[w]here no fundamental vested right is involved, the superior court's review is limited to examining the administrative record to determine whether the adjudicatory decision and its findings are supported by substantial evidence in light of the whole record.' " (*Id.* at p. 1057.)

We recognize that "[a]s a general rule, '[u]nless expressly provided, statutes should not be interpreted to alter the common law, and should be construed to avoid conflict with common law rules.' " (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297.) But here, Water Code section 13330, subdivision (e) expressly rejects the independent judgment standard as the basis for the trial court's review of administrative civil liability orders, and Code of Civil Procedure section 1094.5, subdivision (c) directs trial courts to review such decisions for substantial evidence.

37

## *2. This Court's Review of the Trial Court Decision*

Next, we move to the standard of review we are to employ on appeal, which the parties also contest. The Regional Board argues that we apply the same substantial evidence standard the trial court should have applied, "giving no deference to the trial court and reviewing *de novo* whether the *Board's findings* in the ACL were supported by substantial evidence in the entire record." Respondents, on the other hand, assert that "this Court reviews the *trial court's findings* for substantial evidence."

We will apply the same standard the trial court should have applied and review the Board's findings for substantial evidence. (See *Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1590 ["[I]f the court should have employed the alternative, substantial evidence test, its determinations would be subject to review by applying the same test, de novo, to the administrative record."]; cf. *Ogundare v. Department of Industrial Relations* (2013) 214 Cal.App.4th 822, 828 [" 'Regardless of the nature of the right involved or the standard of judicial review applied in the trial court, an appellate court reviewing the superior court's administrative mandamus decision always applies a substantial evidence standard.' "].) In doing so, "[w]e review the administrative record to determine whether the agency's findings were supported by substantial evidence, resolving all conflicts in the evidence and drawing all inferences in support of them." (*JHK Enterprises*, *supra*, 142 Cal.App.4th at p. 1058.)

Of course, we review the trial court's legal determinations under the de novo standard. (*Building Industry*, *supra*, 124 Cal.App.4th at p. 879; *Foundation*, *supra*, 12 Cal.App.4th at p. 190; *Imperial Irrigation Dist. v. State Water Resources Control Bd.* (1990) 225 Cal.App.3d 548, 553.) This means "we are not bound by the legal determinations made by the state or regional

38

agencies or by the trial court . . . [b]ut we must give appropriate consideration to an administrative agency's expertise underlying its interpretation of an applicable statute." (*Building Industry*, *supra*, at p. 879.)

## B.    The Basin Plan and Clean Water Act

The ACL Order was premised on discharges in violation of the Regional Board's Basin Plan and the Clean Water Act.  The Regional Board alleged two violations in its ACL Complaint.  The first alleged was that Respondents violated Discharge Prohibition No. 9 (Prohibition 9) in the Basin Plan and section 301 of the Clean Water Act (33 U.S.C. § 1311) for the discharge and continued placement of approximately 8,500 cubic yards of fill into waters of the State and the United States.  The second violation alleged that Respondents failed to obtain a certification for the discharge of dredged or fill material into navigable waters of the United States as required by section 401 of the Clean Water Act (Section 401 Certification).  The ACL Order issued based on these discharges.  The trial court concluded the Regional Board's findings that justified the ACL Order were not supported by substantial evidence.  Several of its reasons were not rooted in considerations of substantial evidence, but whatever the reasons, the trial court erred.

### 1.  *Grounds for Decision*

The Regional Board adopted the Basin Plan pursuant to Water Code section 13240, as the "legal, technical, and programmatic bases of water quality regulation in the [r]egion." (Wat. Code, § 13240; Basin Plan, § 1.4 < https://www.waterboards.ca.gov/sanfranciscobay/basin_planning.html> (as of Feb. 18, 2021) (*Basin Plan*).)[9]  To protect water quality, the Basin Plan includes 18 discharge prohibitions that apply throughout the region, and

---

[9]    The Regional Board requests we take judicial notice of the Basin Plan prohibition it found Respondents violated.  Respondents do not oppose this request.  We grant the request.

must be met at all times.  (*Id.*, § 4.2.)  Prohibition 9 forbids the discharge of "[s]ilt, sand, clay, or other earthen materials from any activity in quantities sufficient to cause deleterious bottom deposits, turbidity or discoloration in surface waters or to unreasonably affect or threaten to affect beneficial uses." (*Id.*, Table 4-1: Discharge Prohibitions.)

Section 301 of the Clean Water Act prohibits the discharge of pollutants into any waters of the United States without a permit.  (33 U.S.C. § 1311.)  To discharge fill into waters of the United States, one must apply to the Corps for a Clean Water Act section 404 dredge and fill permit (404 Permit) or a Rivers and Harbors Act section 10 permit (for pier construction). (33 U.S.C. §§ 1344, 403.)  In order to receive a 404 Permit, the applicant, unless exempt, must obtain a Section 401 certification from the state where the discharge originates or construction occurs.  (33 U.S.C. § 1341(a)(1).) Applications for such certification in California are filed with a regional board's executive officer.  (Cal. Code Regs., tit. 23, § 3855.)  The 404 Permit cannot issue unless the regional board provides a water quality certification. (33 U.S.C. § 1341(a).)  The certification may add conditions to the Corps' permit to ensure that the proposed activity will comply with water quality standards and "any other appropriate requirement of State law."  (33 U.S.C. § 1341(d).)  Under Water Code section 13385, subdivision (a), a person who violates Clean Water Act sections 301 or 401 "shall be liable civilly."  (Wat. Code, § 13385, subd. (a)(5).)

In its statement of decision, the trial court expressed multiple, overlapping reasons why, even without issuance of a permit or certification, Respondents did not violate the Basin Plan or the Clean Water Act.  As discussed below, none of its reasons justified setting aside the ACL Order.

a.  <u>Waters of the United States</u>

40

Just as in its CAO decision, the trial court concluded the ACL Order was invalid because the Regional Board did not demonstrate that Respondents' fill material was discharged into "waters of the United States." It found "the evidence would not be enough to establish that the island (other than interior channels and ditches) is waters of the United States."

As with the CAO, the court's rationale overlooks the fact that at least some of Respondents' discharges of fill material occurred in waters of the United States. The trial court's finding that "the evidence would not be enough to establish the island (other than the interior channel and ditches) is waters of the United States" recognizes that the island's water filled "channels and ditches" were jurisdictional waters. Respondents do not disagree. Because at least some waters of the United States were impacted by Respondents activities, the trial court erred in setting aside the ACL Order on this ground.

b. Harm to Beneficial Uses

The trial court also found "the evidence [was] not sufficient to support the conclusion that the levee work adversely affected beneficial uses", nor could it "support a finding that that the levee work violated requirements in the basin plan that prohibit discharges into surface waters that affect beneficial uses."

Had the court applied the substantial evidence standard to the Regional Board's findings, as we do, it would have acknowledged ample evidence of the levee work's harm beneficial uses. In the Board's response to Respondents' opposition to the ACL Complaint, the Board's expert presented evidence and opinions similar to those presented in support of the CAO. His reports provided evidence the Site was tidal marsh before Respondents' levee construction. He also identified the harm that resulted from converting the

41

Site, which included the loss of food production into the surrounding channels where fish feed and the loss of shallow water habitat in the island's tidal channels where fish would spawn. The expert also presented evidence that mass vegetation die-off occurred and endangered fish were harmed because the levee cut off tidal connectivity to the island. There was ample evidence that Respondents' activities unreasonably affected or threatened to affect beneficial uses.

### c. Whether Findings Support the Decision

In an apparent reference solely to the Basin Plan violation, the court concluded "[t]here is no finding about which requirements are at issue, and no reference to the administrative record that makes the reference clear." The grounds for the Basin Plan violation are in the ACL Complaint, which states Respondents "discharged and the Club permitted continued placement of approximately 8,586 cubic yards of fill into waters of the State and United States, violating Basin Plan Prohibition No. 9 and Clean Water Act section 301. The fill remains in waters of the State and United States, and is contributing to the ongoing degradation of approximately 27.1 acres of surface water and wetlands at the Site." The analysis accompanying the ACL Complaint further explains the reasons for the Basin Plan violation with reference to the administrative record. Over the course of the enforcement proceeding, the Board submitted evidence supporting the factual bases for these violations. The ACL Order was sufficiently supported by the Board's finding that Respondents' activities violated Prohibition 9.

### d. Number of Discharges

The trial court also concluded that the evidence did not support the Regional Board's conclusion that the violation was continuous and had exceeded 1,000 days by the time of the ACL hearing. In the court's view,

"[b]ecause the violation requires a discharge, and the discharge requires an addition, the violation ended when the addition stopped." The Regional Board argues the trial court erred when it rejected the number of days Respondents were in violation of the law as the basis for calculating the penalty.

From the time levee construction began in early 2014 through the date of the ACL hearing in December 2016, the Regional Board determined Respondents' violation had occurred for 1,013 days and was continuing. The number of days the condition existed was used as a multiplier to determine Respondents' maximum liability prior to any adjustments.

We see no reason to address the legal issue that would require us to define the temporal nature of discharges. Generally, courts decide actual controversies rather than academic propositions. (*Bell v. Board of Supervisors* (1976) 55 Cal.App.3d 629, 636–637.) At the ACL hearing, a member of the Regional Board prosecution team who worked on the penalty determination explained the basis for the penalty imposed, saying: "The $4.6 million penalty corresponds to the base liability related to volume of fill discharge, and does not include liability for days of violation." Thus, while the continuous nature of the violation factored into initial liability calculations, the daily tally was *not* used to calculate the $4.6 million penalty that was ultimately proposed. Accordingly, it was not relevant or material to the $2.8 million ACL Order the Board ultimately assessed. We later address the propriety of the ACL Order's penalty amount. (See *post*, Sec. III.C.3.)

### 2. Issue Preclusion

In supplemental briefing, the Regional Board contends that legal conclusions and factual findings recently made by the district court in a separate enforcement action against Respondents control issues in this case

43

related to the Clean Water Act under issue preclusion principles of res judicata. Res judicata " 'preclud[es] parties from contesting matters that they have had a full and fair opportunity to litigate,' " and "protect[s] against 'the expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibility of inconsistent decisions.' " (*Taylor v. Sturgell* (2008) 553 U.S. 880, 892.)

In the *Sweeney* District Court Opinion, *supra*, 2020 WL 5203474, the district court entered judgment in favor of the plaintiff United States against Respondents. (*Id.* at p.*44.) The district court determined "Sweeney violated and remains in violation of the Clean Water Act . . . as a result of unpermitted, non-exempt construction of a levee and other additions of pollutants (dredged or fill material) . . . to waters of the United States . . . on Point Buckler Island. . ." (*Ibid.*) The court also found the Club in violation of the Clean Water Act for Sweeney's actions. (*Id.* at p. *45.) In reaching its decision, the district court made several factual findings. It found that Respondents' levee blocked tidal flow into the island resulting in the destruction of wetlands vegetation and harm to water quality and aquatic habitat that adversely affected fish. (*Id.* at pp. *16–18.) In determining that Respondents violated the Clean Water Act, the court concluded as a legal matter that Respondents' discharges occurred in "waters of the United States" because "at the time [Respondents] initiated their activities, Point Buckler Island consisted almost entirely of tidal-water channels and marsh wetlands abutting tidal waters . . . and [Respondents] discharged pollutants into those aquatic waters." (*Id.* at pp.*26–32.)

The Regional Board contends the doctrine of issue preclusion applies to the district court's determination that Respondents violated Clean Water Act section 301.

There is no need for us to analyze the application of issue preclusion in this case. Our conclusions that the ACL Order is supported by substantial evidence and that none of the other grounds asserted in the court's decision for setting aside the ACL Order were correct obviates any need to apply the federal findings.[10]

## C. Eighth Amendment

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (U.S. Const., 8th Amend.)

The Eighth Amendment prohibition on excessive fines " 'limits the government's power to extract payments, whether in cash or in kind, "as punishment for some offense." ' " (*United States v. Bajakajian* (1998) 524 U.S. 321, 328 (*Bajakajian*).) The California Constitution contains a similar protection. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 (*R.J. Reynolds*).) The touchstone of constitutional inquiry under the excessive fines clause is proportionality. (*Bajakajian*, at p. 334.) The amount of the fine must bear some relationship to the gravity of the offense that it is designed to punish, and a fine that is grossly disproportional to the gravity of the defendant's offense violates the excessive fines clause. (*Ibid*.) In deciding the matter, we consider "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*R.J. Reynolds*, at pp. 728, 730.)

---

[10] Respondents make several requests for judicial notice in association with their opposition to the Regional Board's res judicata arguments. Since we need not address the res judicata argument, we deny the Respondents' requests as unnecessary to resolve the issues before us. (See *Mangini, supra*, 7 Cal.4th at p. 1063.)

45

"We review de novo whether a fine is constitutionally excessive and therefore violates the Eighth Amendment's Excessive Fines Clause." (*United States v. Lewis* (9th Cir. 2003) 62 Fed.Appx. 757, 762; see also *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001) 532 U.S. 424, 435–36 (*Cooper*).).  Factual findings made by the trial court in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous." (*Bakakajian*, *supra*, 524 U.S. at pp. 434436, fn.10.)

The trial court found the penalty was "grossly disproportional to the gravity of Plaintiffs' offense."  This was because it considered Respondents' culpability to be low; the penalty was grossly disproportional to the harm caused; there was a gross disparity between penalties imposed by the Regional Board for similar behavior; and Respondents could not afford to pay the penalty imposed.  The Board contends the penalty was not constitutionally excessive.

We agree with the Board.  The trial court's findings were based on the improper exercise of its independent judgment, so we will disregard them.  There was substantial evidence in the administrative record to support the Board's findings that bear on each prong of the constitutional analysis.  We also reach different legal conclusions than the trial court.

### 1. *Respondents' culpability*

The trial court found Respondents' culpability was low.  It based this conclusion largely on Sweeney's testimony.  Sweeney said that he contacted certain state agencies before beginning work and "came away with the understanding that no permits were needed."  The court also credited Sweeney's testimony regarding his belief that permits were needed only for islands submerged by the tides whereas the Site was "high and dry" as well as his ignorance about the need for "[Clean Water Act section] 401

46

certifications" from the Regional Board.  The court also found no evidence that marsh landowners commonly understood levee work requires permits or that Clean Water Act certifications were common knowledge.  Because the court's findings were based improperly on its exercise of independent judgment and weighing of the evidence, we do not accept them.

Had the court correctly applied the substantial evidence standard to the Regional Board's findings, as we do, it would have acknowledged ample evidence of Respondents' high culpability.  Years before his purchase of the Site, Sweeney had experience with various government agencies with jurisdiction over Suisun Marsh at another property he owned.  His levee work there resulted in illegal discharges of fill contrary to permit conditions and direction from the relevant agencies, and he was found in violation for his work.  Sweeney had also been involved with other duck hunting clubs in Suisun Marsh and had prior experience securing permits for maintenance activities that would discharge fill into the marsh.  He had previously communicated by email with state agencies for permits to repair a levee breach at one of those clubs.  In addition, there was ample evidence that Sweeney continuously performed work at the Site after regulators directed him to stop.  These experiences sufficiently demonstrated Sweeney's willful indifference toward the regulatory process and a knowing rejection of the need to apply for permits in order to work at the Site.  These facts demonstrated Sweeney's high culpability.

### 2. Relationship between the harm and the penalty

The trial court also concluded the penalty was "grossly disproportional to the harm."  It based this conclusion on a finding that the Regional Board had not established that fish used the channels at the Site or that there was harm to any specific endangered species of fish.  The court, on the other hand,

47

viewed the benefits to the environment of duck ponds over tidal marsh were "clear and definite." It found that had Respondents' been allowed to complete their levee work, they would have "created a net benefit for the environment rather than a harm." Again, the court's improper exercise of its independent judgment led it to err, and we cannot validate its finding.

Had the court applied the substantial evidence standard to the Regional Board's finding, as we do, it would have acknowledged that the substantial penalty correlated with the major harm caused by Respondents' activities. The Board's expert presented ample evidence that Respondents' levee construction converted the Site from tidal marshland and adversely impacted beneficial uses at the Site including estuarine habitat, fish migration, preservation of endangered species, fish spawning, and wildlife habitat. (See *ante,* Section III.B.1.b.) In consideration of these impacts, the Board categorized the harm caused by Respondents as "major" when determining the penalty. Since there was substantial evidence to support this assessment in the record, we conclude Respondents caused significant harm and it was reasonably related to the significant penalty imposed.

### 3. Penalties imposed in similar statutes

This factor has been explained "as the sanctions imposed in other cases for comparable conduct." (*Cooper, supra,* 532 U.S. at p. 435.) The trial court found "a great disparity between the non-existent or modest penalties the Regional Board has imposed for similar behavior, and the severe penalty imposed here." It observed that the "top-ten Regional Board penalties have generally been reserved for discharges of millions of gallons of untreated sewage and discharges resulting in hundreds of observably dead fish," and this case posed "no threat to public health or observably dead fish." It also

48

observed that "there is no evidence that the Regional Board has ever imposed any penalties on duck clubs in [the] Marsh for levee work."

We are not persuaded that the $2.8 million penalty was not comparable to other cases or unreasonable. The ACL Complaint originally proposed a $4.6 million penalty for Respondents' alleged unauthorized discharges. It included a 14-page exhibit explaining its method for arriving at the proposed penalty in accordance with the State Board's Water Quality Enforcement Policy methodology for assessing civil liabilities. The prosecution team considered, and explained, how it considered numerous statutory criteria to determine the liability including the nature and extent of Respondents' violations; the degree of toxicity of the discharge; the economic benefits to Respondents from the discharges; and other factors similar to the ones considered in our constitutional analysis here. The $4.6 million penalty originally proposed fell between the maximum liability amount of $39,211,860 and the minimum amount of $1,550,859 and reflected the continuing and harmful nature of Respondents' violations. (See *Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 398 [$9.5 million civil penalty against a developer for 73 violations of Coastal Act not excessive].) While significant, the $4.6 proposed penalty already reflected reductions recommended by the prosecution on the basis of factors as justice required. A member of the Board's prosecution team testified that one adjustment was made to be consistent with earlier Regional Board orders involving a single entity's dredging and fill. Even at the proposed $4.6 million, the prosecution team found it to be "in line with other actions taken by this Regional Water Board and the resulting harm caused by Dischargers' conduct." At the ACL hearing, a prosecution team member compared the proposed $4.6 million penalty to a $5 million settlement the Regional Board

49

had recently entered with a municipal entity "for a similar discharge and fill, Clean Water Act violations." This is enough to satisfy us that the $2.8 penalty that was ultimately imposed was not disproportionately high.

### 4. Ability to pay

The trial court concluded that Respondents could not afford to pay the $2.8 million penalty. Based on "evidence from Sweeney and a financial expert," the court found the Regional Board overestimated Respondents' net worth by not accounting for "obvious liabilities," including the costs of compliance imposed by the CAO (which it had concurrently set aside). The court's conclusion again resulted from its improper exercise of independent judgment, and we cannot accept the court's findings.

Had the court applied the substantial evidence standard to the Regional Board's findings, as we do, it would have acknowledged substantial evidence of Respondents' ability to pay. The Regional Board prosecution staff completed just such an analysis in support of the proposed $4.6 million penalty. It considered Respondents' net cash flow and net worth. The analysis acknowledged that the most complete and accurate accounting of such information comes from an entity's own disclosures, which Respondents did not provide. Absent such direct disclosures from Respondents, the prosecution team reviewed public records for assets belonging to Respondents which included other property Sweeney purchased. It also considered other assets, such as Point Buckler, duck club membership sales, and funds from a Tiburon property Sweeney recently sold. Based on the available information and the lack of any objective financial information from Respondents refuting its analysis, the prosecution team concluded Respondents could pay the original proposed penalty. (Cf. *State of California v. City and County of San Francisco* (1979) 94 Cal.App.3d 522, 530–531 [once evidence established a

50

statutory violation under Water Code provision, defendant had burden to establish the court should impose penalty less than statutory maximum].) The Board itself recognized it "did not have sufficient evidence to do any adjustments based on the ability to pay. . . . [b]ecause we, at the end of all of this, [did] not have documented evidence of Mr. Sweeney's net worth or cash flow, or anything close." On this record, there was sufficient evidence supporting Respondents' ability to pay the penalty.

Moreover, the trial court's findings were clearly erroneous and could not survive any standard of review. The evidence from Sweeney consisted of a declaration attesting to the lack of net taxable income, but he failed to provide any objective information about Respondents' financial condition that could support his conclusion (e.g., financial statements, tax returns) even though he had the opportunity to do so. The evidence from the financial expert was also weak. The expert, a Certified Public Accountant, opined that Sweeney had a negative net worth, after reviewing the prosecution team's analysis and information told to him by Sweeney. But he made clear "there [had] been no verification of any of the information provided by Mr. Sweeney." This evidence provides no support for the court's inability to pay finding.

In light of our analysis, we cannot conclude the $2.8 million assessed in civil penalties was "grossly disproportional" to the gravity of the offense so as to violate the Eighth Amendment's proscription against excessive fines.

### D. Suisun Marsh Preservation Act

Just as it did with the CAO, the trial court concluded when the Regional Board issued the ACL Order, it failed to "act[] in conformity with the Preservation Act and the policies of the Protection Plan" in violation of Section 29302(a). The court employed the same Preservation Act analysis it

51

had used to set aside the CAO to set aside the ACL Order for violating Section 29302(a). We incorporate our earlier analysis here (see *ante*, Section II.C.) and for the same reasons conclude that the trial court's determination that issuance of the ACL Order violated Section 29302(a) was error.

### E. Vindictive Prosecution

"The constitutional protection against prosecutorial vindictiveness is based on the fundamental notion that it 'would be patently unconstitutional' to 'chill the assertion of constitutional rights by penalizing those who choose to exercise them.' " (*In re Bower* (1985) 38 Cal.3d 865, 873.) When a "defendant shows that the prosecution has increased the charges in apparent response to the defendant's exercise of a procedural right, the defendant has made an initial showing of an appearance of vindictiveness." (*People v. Puentes* (2010) 190 Cal.App.4th 1480, 1486.) "Once this prima facie case is made, the prosecution bears a 'heavy burden' of dispelling the appearance of vindictiveness as well as actual vindictiveness." (*Ibid*.) We review the trial court's factual findings for substantial evidence and its legal determinations de novo. (*People v. Sanchez* (2020) 49 Cal.App.5th 961, 983.)

In its statement of decision invalidating the ACL Order, the trial court observed that the parties had not identified any civil case in which the vindictive prosecution doctrine was applied, but nonetheless concluded, "It may be the rare civil case in which a party can make the prima facie showing needed, but in this case the showing has been made." The court found the penalties were "imposed in retribution for [Respondents'] lawsuit challenging the Regional Board's September 2015 order." It further chided the Board for making no attempt to show the penalties were not imposed for vindictive reasons and said the Board "ha[d] not met its burden of dispelling the appearance of vindictiveness as well as actual vindictiveness." The Regional

Board contends there was no basis for the vindictive prosecution finding.  We agree.

As an initial matter, Respondents cite no authority, and we have found none, that applies the vindictive prosecution doctrine outside of criminal proceedings.  We conclude the court erred in its novel application of the doctrine and in setting aside the ACL Order for this reason.  The vindictive prosecution doctrine has also not yet been held to apply to proceedings before administrative bodies.

Even if we assume, without deciding, that the doctrine can apply and that Respondents made a prima facie case, there was substantial evidence disregarded by the trial court that rebutted the presumption.  The Regional Board had contemplated imposing civil liability on Respondents months before Respondents filed the petition for writ of mandate that led to the stay of the 2015 CAO and the Board's eventual decision to rescind it.  In July 2015, Respondents' conduct was internally referred to the Board's enforcement unit for preparation of an administrative civil liability complaint.  That same month, the initial notice of violation was served on Respondents and informed them that "[a]ny person who violates is . . . subject to administrative civil liability."  The 2015 CAO also informed Respondents that their "failure to comply [with the CAO] may result in the imposition of civil liabilities."  Thus, civil liabilities against Respondents were considered by the Board well before Respondents filed suit over the 2015 CAO.  This evidence was sufficient to dispel the appearance of vindictiveness.

There was also substantial evidence to dispel actual vindictiveness.  As discussed in our Eighth Amendment analysis (see *ante*, Section III.C.), the record included the Board's detailed analysis showing how it arrived at the proposed penalty in accordance with the State Board's Water Quality

Enforcement Policy methodology for assessing civil liabilities. The prosecution team considered and explained how its application of numerous statutory criteria to determine Respondents' liability including the nature and extent of the violations; the degree of toxicity of the discharge; the economic benefits to Respondents from the discharges; and other factors. The eventual $4.6 million proposed penalty corresponded to the base liability calculation related to volume of fill discharged by Respondents. Thus, the record included clear analysis regarding the grounds for and amount of the ACL Order, which was plainly connected to the continuing and harmful nature of Respondents' violations, and not vindictiveness or retaliatory intent.

## IV. FAIR HEARING (APPLICABLE TO CAO AND ACL ORDER)

Code of Civil Procedure section 1094.5, subdivision (b)'s "requirement of 'a fair trial' means that there must have been 'a fair administrative hearing.' " (*Lateef v. City of Madera* (2020) 45 Cal.App.5th 245, 252; Code Civ. Proc., § 1094.5, subd. (b) [inquiry in administrative mandamus cases extends to the question "whether there was a fair trial"].) Because the ultimate determination of procedural fairness presents a question of law, we "review the fairness of the administrative proceeding de novo." (*Doe v. University of Southern California* (2016) 246 Cal.App.4th 221, 239; *TWC Storage, LLC v. State Water Resources Control Bd.* (2010) 185 Cal.App.4th 291, 296.)

The trial court concluded that Respondents did not receive a fair trial in either the CAO or ACL hearing. The Regional Board contends the proceedings were fair. We agree with the Board. As we will explain, the trial court again erred. Moreover, Respondents' additional arguments on appeal do not persuade us otherwise.

### A. Separate Functions

54

"One of the basic tenets of the California [Administrative Procedure Act] . . . is that, to promote both the appearance of fairness and the absence of even a probability of outside influence on administrative hearings, the prosecutorial and, to a lesser extent, investigatory, aspects of administrative matters must be adequately separated from the adjudicatory function." (*Nightlife Partners v. City of Beverly Hills* (2003) 108 Cal.App.4th 81, 91, italics omitted; Govt. Code § 11425.10, subd. (a)(4) ["The governing procedure by which an agency conducts an adjudicative proceeding is subject to [the requirement that] [t]he adjudicative function . . . be separated from the investigative, prosecutorial, and advocacy functions within the agency . . ."].)

"[B]y itself, the combination of investigative, prosecutorial, and adjudicatory functions within a single administrative agency does not create an unacceptable risk of bias and thus does not violate the due process rights of individuals who are subjected to agency prosecutions." (*Morongo Band of Mission Indians v. State Water Resources Control Bd.* (2009) 45 Cal.4th 731, 737 (*Morongo*).) "The due process right to an impartial administrative decisionmaker is protected when staff counsel performing a prosecutorial role are distinct from counsel playing an advisory role in the same matter and the counsel are screened from each other." (*Drakes Bay Oyster Co. v. California Coastal Com.* (2016) 4 Cal.5th 1165, 1175.)

"To prove a due process violation based on overlapping functions thus requires something more than proof that an administrative agency has investigated and accused, and will now adjudicate. '[T]he burden of establishing a disqualifying interest rests on the party making the assertion.' . . . That party must lay a 'specific foundation' for suspecting prejudice that would render an agency unable to consider fairly the evidence presented at the adjudicative hearing … it must come forward with 'specific evidence

55

demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias'…. Otherwise, the presumption that agency adjudicators are people of 'conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances' will stand unrebutted." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 221–222.)

The trial court ruled that Respondents did not receive a fair hearing, in part, because the Regional Board failed to separate functions. Observing the Board had identified a prosecution team and an advisory team, the court suggested impropriety because the CAO and ACL Order were written by the prosecution team rather than the advisory team.[11] The court added that the "advisory team did not take an active role in the judicial decision-making function on the substantive legal and factual issues in dispute," and thus "relied on the prosecution team, which was biased in favor of its own positions." For these reasons, the court found the Regional Board "appeared to be biased in favor of the prosecution team, and against [Respondents]." In their appellate brief, Respondents describe the Board as simply "rubber-stamping" the prosecution team's proposed orders as a form of improper separation. They also assert functions were not separated because "Bruce Wolfe, the Board's Executive Officer, commingled prosecutor and decision-making functions."

---

[11]     It is customary for the prevailing party in litigation to provide the decision-maker with a proposed decision. (See Cal. Rules of Court, Rule 3.1312.) That appears to be just what happened in each of these companion cases in the trial court, and we are not aware of any authority that concludes it is a violation of due process for the decision maker to adopt a proposed decision in an administrative or judicial proceeding as its final ruling. Respondents cite no authority that suggests simply the adoption of a proposed decision is improper.

We have no reason to conclude Respondents received unfair hearings because the agency purportedly shirked an obligation based on insufficiently separated functions. The evidence shows the Board's duties were separated. The hearing procedures for both the CAO and ACL explained: "To help ensure the fairness and impartiality of this proceeding, the functions of those who will act in a prosecutorial role by presenting evidence for consideration by the Regional Water Board (Prosecution Team) have been separated from those who will provide advice to the Regional Water Board (Advisory Team)." After identifying the specific individuals in each team, the Board further explained: "Any members of the Advisory Team who normally supervise any members of the Prosecution Team are not acting as their supervisors in this proceeding, and vice versa. Members of the Prosecution Team may have acted as advisors to the Regional Water Board in other, unrelated matters, but they are not advising the Regional Water Board in this proceeding. Members of the Prosecution Team have not had any ex parte communications with the members of the Regional Water Board or the Advisory Team regarding this proceeding." At the outset of both hearings, the Board Chair repeated this separation of functions. The separation of prosecution and advisory roles was followed in both proceedings.

Further, the trial court concluded there was no separation of powers but identified no threat to fairness that occurred as a result. The trial court's findings were based on the *appearance* of bias but lacked " 'specific evidence demonstrating actual bias or a particular combination of circumstances creating an unacceptable risk of bias.' " (*Morongo, supra*, 45 Cal.4th at p. 741; see also *Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792 [" 'Bias and prejudice are never implied and must be established by clear averments.' "].) Respondents' contention that the Board merely "rubber-

57

stamped" the tentative cleanup and abatement order is also unsupported by any evidence. The record shows, and Respondents do not dispute, that the Board adhered to its procedures governing adjudicatory hearings before the Board. (See Cal. Code. Regs., tit. 23, § 648 et seq.) Absent such evidence of actual bias or evidence that the Board failed to maintain internal separation and created a risk of bias, we presume the Board evaluated the factual and legal arguments on their merits.

Respondents' reference to the Board's Executive Officer Bruce Wolfe does not provide evidence of improper separation. Initially, they claim that the Board's failure to separate functions when Wolfe issued the 2015 CAO constitutes a due process violation. The Regional Board does not dispute that prosecutorial and advisory functions were not separated when Wolfe issued the 2015 CAO. But the 2015 CAO was rescinded, and was no longer at issue. The Board's functions were separated for the enforcement actions at issue in this appeal. Although Respondents point to Wolfe's addition to the advisory team in these enforcement actions, they objected to his participation, and by early June 2016—within a month of the objection—the Board Chair agreed to remove him from the advisory team. There is no indication he participated in either a prosecutorial or advisory capacity at either hearing. Indeed, at the CAO hearing, the Board chair expressly acknowledged someone had "stepped into the role that Bruce Wolfe would normally serve." As an indicator of Wolfe's ongoing involvement, Respondents refer to the CAO which required Respondents to submit various corrective action plans "acceptable to the Executive Officer." We are not persuaded. By that time, the CAO had been adjudicated without Wolfe's participation.

## B. Board Rulings

The trial court also found Respondents received unfair CAO and ACL hearings because the Board purportedly failed to decide all the issues needed to resolve the dispute and failed to consider factual and legal issues raised by Respondents. In their appellate brief, Respondents say they contested the CAO with "29 pages of legal arguments [to which] the Board said absolutely nothing." They allude to the same perceived deficiency in the ACL hearing process.

We have no reason to conclude Respondents received unfair hearings because the agency shirked a purported obligation to decide every legal and factual issue raised by Respondents. As the trial court recognized, the California Administrative Procedure Act only requires that an administrative decision following an adjudicative proceeding "shall be in writing and shall include a statement of the factual and legal basis for the decision." (Gov. Code, § 11425.50, subd. (a).) There is no requirement that the agency provide a written response to every issue raised by the parties. Here, the CAO included over 75 findings, and the ACL Order included over a dozen findings and an extensive analysis explaining its methodology for determining the civil liabilities imposed. Both asserted facts and made findings in support of the violations found and attendant penalties. This satisfied Respondents' entitlement to due process.

## C. Insufficient Trial Time

The trial court found Respondents received unfair hearings because the Board did not allow sufficient time for trial. For the CAO hearing, Respondents had been given one hour to present their case, which the court found was "not enough to try a case as complex as this one" and insufficient to give Respondents "a fair opportunity to present their opening statement, examine their percipient witnesses, cross-examine the prosecution team's

witnesses, and make their closing argument." The court further found "the short time gave the appearance that the Regional Board was not interested in determining the truth, but rather . . . it intended and expected to rely on staff, as it usually did, to provide the facts and law." The court observed that Respondents were allowed "two hours" for the ACL hearing but deemed it inadequate for "[a] case of this complexity," which "calls for sufficient time so that the Regional Board can do more than decide how much of a penalty to impose." Respondents assert the insufficient trial time in both proceedings rendered the Board incapable of resolving the factual issues they raised.

We have no reason to conclude Respondents received unfair hearings because of inadequate time. There is no requirement that hearings last for any particular amount of time (see Cal. Code Regs., tit. 23, § 648 et seq.), and reasonable time limitations are necessary and inevitable. (Cf. *Reed v. California Coastal Zone Conservation Com.* (1975) 55 Cal.App.3d 889, 895 [petitioners who were restricted to 10 minutes' oral argument at hearing and never objected not denied due process].) Here, the Board doubled the amount of time originally allotted to each party in advance of the CAO hearing so that each party had one hour. The CAO hearing lasted for almost 4 hours and included extensive questioning of both sides by Board members. Similarly, the Board doubled the amount originally allotted to each party in advance of the ACL hearing so that each party had two hours. In both hearings, the time allotment was reasonable and did not offend due process. Further, in adopting the CAO and issuing the ACL Order, the Board made dozens of findings of fact addressing the disputes between the parties.

### D. Submission of Evidence and Arguments

In their appellate brief, Respondents contend the Board's procedures "condoned staff sandbagging." In their view, they were "sandbagged" because

the Board submitted their evidence and arguments in reply to the Respondents' oppositions to the proposed enforcement orders. This was not evidence of unfairness. Again, the record shows, and Respondents do not dispute, that the Board adhered to procedures governing adjudicatory hearings before the Board. (See Cal. Code. Regs., tit. 23, § 648 et seq.) The authority Respondents rely on pertaining to summary judgment procedures in litigation does not apply.

### E. Availability of Hearing

In their appellate brief, Respondents assert the Board "showed disrespect for due process and the rule of law" because the Board did not provide "either a pre-deprivation or post-deprivation hearing on the [2015 CAO]." This argument is borderline frivolous. The Board rescinded its 2015 CAO, and it is no longer at issue. Respondents received full hearings prior to the issuance of both the CAO and ACL Order.

### F. The Regional Board's Expert

In their appellate brief, Respondents assert "the Board's principal expert was biased against John Sweeney," and offer this as another reason the hearings were unfair. The expert at issue was Stuart Siegel. Both Sweeney and the Board considered retaining Siegel as an expert, and the Board eventually retained him. He was the principal author of the Board's Technical Assessment. Respondents describe personal animosity between Sweeney and Siegel, and at one point after being retained by the Board, Siegel emailed several people the following: "BE CAREFUL in dealing with Sweeney. I've been doing a little recently. . . . HIGH RISK situation." Respondents contend Siegel's personal animosity towards Sweeney and "financial interest in discrediting Mr. Sweeney's accusations of fraud, which could have threatened his consulting practice" evidenced bias. They also

61

argue the "great deference" the Board accorded Siegel for both his assessments and legal analysis demonstrated bias.

These contentions do not present evidence of bias, nor do they describe circumstances that create an unacceptable risk of bias. As Respondents recognize, Siegel was the expert for the prosecution team, not a part of the advisory team or the Board. As such, he was a witness not a decisionmaker and any animosity he had towards Sweeney was irrelevant to whether Respondents received a fair hearing from the Board. Also, since Siegel was not an adjudicator, his purported "financial interest" is not the type of "pecuniary interest" that establishes the improper bias that affects adjudication. (See *Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1025 [financial interest of adjudicator raises due process concerns].) Respondents' deference argument is not supported by evidence or authorities, so we will not entertain it. (See, e.g., *Nickell v. Matlock* (2012) 206 Cal.App.4th 934, 947 (*Nickell*) [conclusory assertions in brief unsupported by citations to evidence or legal authority are forfeited].)

## G. Totality of the Circumstances

The trial court also concluded Respondents received did not receive fair hearings under the totality of the circumstances. Although adjudicators are presumed to be impartial, "the presumption of impartiality can be overcome" by "a particular combination of circumstances creating an unacceptable risk of bias." (*Morongo, supra*, 45 Cal.4th at p. 741.) This is sometimes referred to as the "totality-of-the circumstances approach." (*Id.* at p. 740.) Since we have concluded none of the individual grounds Respondents asserted for an unfair trial was proper, we conclude there was no particular combination of those circumstances that created an unacceptable risk of bias. Under the

totality of the circumstances, neither the CAO nor ACL Order should have been set aside.

## H.    Additional Fairness Issues Related to ACL Hearing

In its ACL decision, the court noted "other evidence of unfairness" Respondents argued to the trial court, including "(a) ex parte communications by a Regional Board member who was eventually disqualified, (b) testimonials by Regional Board members during trial endorsing the prosecution team, (c) the Regional Board's unwillingness to keep Sweeney's private financial information confidential, combined with his criticism of him for not providing more financial information, (d) reliance by Regional Board members on incorrect personal knowledge, (e) unawareness by Regional Board members of Plaintiff's arguments, (f) blindness of Regional Board members to weaknesses in the prosecution's team's arguments, and (g) evidence that the Regional Board does not fairly interpret and apply the law, but rather interprets it to support the decisions."  Beyond identifying these arguments, the trial court did not address, analyze, or otherwise rule on these contentions.  In their appellate brief, Respondents argue all points as further evidence of unfair hearings.  Except for the first issue regarding ex parte communications, we shall not consider these additional arguments. These arguments either present issues rejected elsewhere in the parties' briefs and in our opinion, or they are unsupported by any authority establishing such conduct as bias or evidence of an unfair hearing.  (See *Nickell*, *supra*, 206 Cal.App.4th at p. 947.)

Respondents proffer two incidents of ex parte communications involving a Board member which they say reinforced the appearance of unfairness and created an appearance of bias.  First, they claim the Board member "initiated a secret communication with the prosecution team about

63

the merits of the case." Second, they assert the same Board member, in communicating with an environmental group which had appeared before the Board against Sweeney, described a statement Sweeney made on social media as "a lie." The "secret communication" was a one-way communication by the Board member to a prosecution team member expressing his view that the ACL penalty was too high. The statement the Board member said was a "lie" was a comment Sweeney made on social media that the Board member, who was also a member of BCDC, had "succeeded in getting the act of kiteboarding in public waters a fine of $30k." Even if we assume these communications were prohibited, they do not overcome the presumption of impartiality afforded the adjudicators. At the outset of the ACL hearing, the Board member at issue recused himself, left the hearing, and took no part in deciding the ACL Order. In light of his recusal, Respondents have not persuaded us that the hearing was unfair.

## V.     OTHER ISSUES

In both of its decisions, the trial court made rulings on additional issues not otherwise addressed in our analysis. In its CAO decision, the trial court (1) sustained Respondents' objections to portions of the administrative record submitted by the Regional Board; (2) denied the Regional Board's motion to strike Respondents' opening brief; and (3) denied the Regional Board's motion to enforce the CAO. Likewise, in reviewing the ACL Order, the trial court (1) denied the Regional Board motion to strike Respondents' opening brief, and (2) sustained Respondents' objections to portions of the administrative record submitted by the Regional Board. The trial court also expressly declined to rule on "several requests for judicial notice, to augment the record, and to correct the record" on the grounds that such requests "appear[ed] unnecessary to resolve the principal issues in this case." The Regional Board

64

challenges several of these issues on appeal.  Because we reverse the judgments on substantive grounds and shall direct the trial court to deny Respondents' motions for writs of mandate with respect to both the CAO and ACL Order, we need not resolve these issues, which are unnecessary to our decision.

## DISPOSITION

The judgment on the CAO in Solano County Superior Court Case No. FCS048136 and the judgment on the ACL Order in Solano County Superior Court Case No. FCS048861 are reversed, and the writs of mandate are vacated.  The matters are remanded to the trial court with directions to deny Respondents' petitions for writs of mandate and requests to set aside the CAO and ACL Order, and for further proceedings consistent with this opinion.

The Regional Board's cross-complaint seeking to enforce the CAO and ACL Order is reinstated.

Appellants are awarded costs on appeal.

_____
Siggins, J.*


WE CONCUR:


_____
Fujisaki, Acting P.J.


_____
Jackson, J.

---

* Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                              Solano County
                                          Superior Court


Trial Judge:                              Hon. Harry S. Kinnicutt


Counsel:

Xavier Becerra, Attorney General, Robert W. Byrne, Senior Assistant
Attorney General, Annadel A. Almendras, Supervising Deputy Attorney
General, Matthew G. Bullock, Daniel S. Harris, Deputies Attorney General,
Joshua Patashnik for Appellants.

John Briscoe, Lawrence S. Bazel, Briscoe Ivester & Bazel, LLP, for
Respondents

Kerry Shapiro, Martin Patrick Stratte, Jeff Mangels Butler & Mitchell, LLP.
Amicus for Respondents.